**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| E.S., et al., | Case No. CV 17-2629 SS |
| Plaintiffs, | |
| v. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' IDEA APPEAL** |
| CONEJO VALLEY UNIFIED SCHOOL DISTRICT, | **[Dkt. Nos. 43-44]** |
| Defendant. | |

**I.**

**INTRODUCTION**

On April 6, 2017, Plaintiffs E.S. ("Student"), his mother and Guardian Ad Litem Staci S. ("Mother"), and father Terry S. ("Father") (collectively, "Plaintiffs") filed a Complaint pursuant to 20 U.S.C. §§ 1400 et seq. for Violation of the Individuals with Disabilities Education Act ("IDEA") and for Recovery of Reasonable Attorneys' Fees against Defendant Conejo Valley Unified School District ("Defendant" or "District"). Plaintiffs challenge certain portions of a January 9, 2017 decision (the "Decision") by an

Administrative Law Judge ("ALJ") at the California Office of Administrative Hearings ("OAH"). Plaintiffs also seek to recover attorneys' fees and expenses in connection with the underlying administrative proceeding and this action pursuant to 20 U.S.C. § 1415(i)(2)(B). (Complaint at 1-2). Upon the parties' consent, this matter was reassigned to the undersigned Magistrate Judge on September 21, 2017. (Dkt. No. 25).

The parties filed their respective opening briefs on April 27, 2018. ("P Br.," Dkt. No. 43; "D Br.," Dkt. No. 44). The District filed the Administrative Record on May 2, 2018. ("AR," Dkt. No. 45). The parties' respective Oppositions were filed on May 18, 2018. ("P Opp.," Dkt. No. 46; "D Opp.," Dkt. No. 47). On June 21, 2018, the Court held a hearing.

For the reasons stated below and on the record at the hearing, Plaintiffs' Appeal is GRANTED IN PART and DENIED IN PART. The Court reverses the portion of ALJ's Decision finding that the April 2016 IEP offered Student a FAPE despite Defendant's failure to conduct a functional behavior assessment and the significant impediment that that failure posed to Parents' meaningful participation in the IEP process. The Court further reverses the ALJ's finding that Student should not be awarded any compensatory education one-on-one aide services. Accordingly, the Court AWARDS Student an increase in the compensatory education services granted by the ALJ to include an additional: seven hours of individual counseling by a credentialed District counselor; seven hours of speech and language therapy from a District speech and language

pathologist; sixty minutes of behavior intervention services from a District behaviorist; and fifty-two and a half hours of one-on-one aide services. Plaintiffs' request for reimbursement of $700.00 for the cost of Dr. Ott's services is also GRANTED. All of Plaintiffs' remaining claims and requests are DENIED. Plaintiffs may file a Motion for Attorneys' Fees within thirty days of the date of this Order, as more fully discussed in Part VII.E below.

## II.
### STATUTORY OVERVIEW

Under the IDEA, "[a] child is substantively eligible for special education and related services if he is a 'child with a disability,' which is statutorily defined, in relevant part, as a child with a serious emotional disturbance, other health impairment, or specific learning disability and who, by reason thereof, needs special education and related services." L.J. by & through Hudson v. Pittsburg Unified Sch. Dist., 850 F.3d 996, 1003 (9th Cir. 2017) (citing 20 U.S.C. § 1401(3)(A)). However, "[e]ven if a child has such a disability, he or she does not qualify for special education services if support provided through the regular school program is sufficient." L.J., 850 F.3d at 1003. Accordingly, as the Ninth Circuit has explained,

"[t]he IDEA provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain

goals and procedures." <u>Ojai Unified Sch. Dist. v. Jackson</u>, 4 F.3d 1467, 1469 (9th Cir. 1993). The IDEA seeks "to ensure that all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). "A FAPE is defined as an education that is provided at public expense, meets the standards of the state educational agency, and is in conformity with the student's IEP [individualized education program]." <u>Baquerizo v. Garden Grove Unified Sch. Dist.</u>, 826 F.3d 1179, 1184 (9th Cir. 2016) (citing 20 U.S.C. § 1401(9)). Upon request of a parent or agency, a local educational agency must "conduct a full and individual initial evaluation" to determine whether a child has a disability and the child's educational needs. 20 U.S.C. § 1414(a)(1)(A)-(C). If a child is determined to have a disability, a team including a local educational agency representative, teachers, parents, and in some cases, the child, formulates an IEP. [FN4] § 1414(d)(1)(B). The local educational agency must conduct a reevaluation of the child if it "determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation," or if a reevaluation is requested by the child's parents or teacher. § 1414(a)(2)(A).

\\

\\

> [FN4] An IEP includes the following: 1) a
> statement about the child's level of academic
> achievement; 2) "measurable annual goals";
> 3) a description of how the child's progress
> towards the goals will be measured; and 4) a
> statement of the special education and other
> services to be provided. 20 U.S.C.
> § 1414(d)(1)(A).

> The IDEA permits parents and school districts to
> file due process complaints "with respect to any matter
> relating to the identification, evaluation, or
> educational placement of the child, or the provision of
> a free appropriate public education to such child."
> § 1415(b)(6)(A). The state educational agency or local
> educational agency hears due process complaints in
> administrative due process hearings. § 1415(f)(1)(A).
> If a party disagrees with the administrative findings
> and decision, the IDEA allows for judicial review in
> state courts and federal district courts.
> § 1415(i)(2)(A).

Avila v. Spokane Sch. Dist. 81, 852 F.3d 936, 939-40 (9th Cir. 2017).

Parental involvement in the IEP process "is a central feature of the IDEA." Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1300 (9th Cir. 1992). As the Ninth Circuit has emphasized:

Parental participation in the IEP and educational placement process is critical to the organization of the IDEA. See 20 U.S.C. § 1414(d)(1)(B)(i) (requiring the inclusion of parents on the IEP team); 34 C.F.R. § 300.321(a)(1) (same); 20 U.S.C. § 1415(b)(1) (requiring opportunities for parents "to participate in meetings with respect to identification, evaluation and educational placement of the child"). Indeed, the Supreme Court has stressed that the IDEA's structure relies upon parental participation to ensure the substantive success of the IDEA in providing quality education to disabled students:

> [W]e think that the importance Congress attached to these procedural safeguards cannot be gainsaid. It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . demonstrates the legislative conviction that adequate compliance with the procedures prescribed

would in most cases assure much if not all of
what Congress wished in the way of substantive
content in an IEP.

[Bd. of Educ. v. Rowley, 458 U.S. 176, 205-06 (1982)]
(citation omitted). . . .

Echoing the Supreme Court, we have held that parental
participation safeguards are "[a]mong the most important
procedural safeguards" in the IDEA and that
"[p]rocedural violations that interfere with parental
participation in the IEP formulation process undermine
the very essence of the IDEA." [Amanda J. v. Clark Cnty.
Sch. Dist., 267 F.3d 877, 882, 892 (9th Cir. 2001)]. We
have explained that parental participation is key to the
operation of the IDEA for two reasons: "Parents not
only represent the best interests of their child in the
IEP development process, they also provide information
about the child critical to developing a comprehensive
IEP and which only they are in a position to know." Id.
at 882.

Doug C. v. Hawaii Dep't of Educ., 720 F.3d 1038, 1043-44 (9th Cir.
2013).

\\
\\
\\
\\

**III.**

**BACKGROUND FACTS**

Student was born on April 26, 2010, (AR 0002), to a birth mother with schizoaffective disorder and a birth father with bipolar disorder. (AR 542). Student was adopted by Mother and Father when he was seven weeks old. (Id.). At the time of the administrative hearing in November 2016, Student was a six-year-old first grade student in the District. (AR 540, 542; D Br. at 2). Student is eligible for special education services under the primary qualifying disability of emotional disturbance and the secondary qualifying disability of other health impairment, i.e., Attention Deficit Hyperactivity Disorder. (AR 436).

On February 6, 2015, Mother submitted paperwork to the District to enroll Student in kindergarten beginning in fall 2015. (AR 322-23). Mother stated on the form that Student was not currently, and had never been, enrolled in a special education program. (AR 323).

On April 26, 2015, Mother completed a health history form in which she stated that Student did not appear restless or overactive, did not have problems in getting along with others, and presented problems in discipline that were merely "usual [for a] 5 yr. old." (AR 324). Mother did indicate, however, that Student sucked his thumb, was receiving occupational therapy for "low muscle tone," and suffered from "speech disfluency," i.e., stuttering or stammering. (Id.). Mother's representations about

Student's behavior history were inaccurate, as Student had exhibited pervasive behavioral problems in preschool. Student had received behavioral interventions from the time he was two years old and had been assigned a "one-to-one" aide when he was three years old, along with an "adult shadow" for after-school hours. (AR 2555-59). Mother admitted at the administrative hearing that she deliberately omitted negative information because she did not want District employees to "label" Student, did not know for certain how he would act at school in a "more structured environment," and felt like she "would be putting the cart before the horse if [she] said, you know, he was a wild child or he had some issues." (AR 2703). Student was assigned to Madroña Elementary School as a kindergartener for the 2015-2016 school year.

On August 25, 2015, the day before the start of the school year, Mother met with Madroña's principal, Hallie Chambers. During this meeting, Mother told Chambers for the first time about Student's behavioral and mental health history, including that "he had been hitting, punching, kicking, pushing." (AR 2560). Mother also told Chambers that Student had been seeing a psychiatrist because it had reached the point in July where Mother and Father "couldn't control him anymore[.]" (AR 2561). That same day, Chambers emailed Student's assigned kindergarten teacher, Pam Meiron, and other Madroña staff. (AR 348). Chambers summarized the information that Mother had given her, including that Student "exhibits aggressive behaviors (hitting/punching)" and was seeing a psychiatrist, that his birth family had a "history of bipolar

and other mental health disorders," and that while Student's behavior had improved in his last year of preschool, he regressed over the summer while at camp. (Id.). Chambers stated that she wanted to set up a "student study team" ("SST") because she thought "it [was] important that we communicate."[1] (Id.).

Student began kindergarten on August 26, 2015. In his first few weeks of school, he performed well academically, but exhibited poor impulse control and poor interpersonal skills, as he would "pok[e] and annoy[]" his fellow students and was sometimes "disruptive." (AR 2014; see also AR 2005-06, 2013). However, Meiron testified that it is typical for students in the first few weeks of kindergarten to be "fidgety" and have some attention span and impulse control problems. (AR 2007). Nonetheless, on September 9, 2015, Meiron sent Student to the principal's office for "kicking and punching" other students "during recess and in class." (AR 470). Despite Student's behavioral issues, Meiron testified that Student did not appear to require a special education assessment at that time. (AR 2013-14).

\\
\\

---

[1] According to the ALJ, "Student Study Team meetings are held to address whether a pupil should be referred for assessment for special education, evaluated for a section 504 plan, or if other interventions in the general education curriculum are recommended by the team." (AR 545 n.2); see also L.J., 850 F.3d at 1000 ("The purpose of an SST is to develop interventions for students having trouble in school, either academically or behaviorally."). The Ninth Circuit has recognized that "[i]n many schools, an SST is the first step in addressing a student's needs before initiating the IEP process." Id.

On September 16, 2015, school staff and Student's Parents held their first of three SST meetings. The parties presented conflicting testimony as to what transpired at the meeting. School psychologist Miriam Carmona testified that the team discussed Student's behavioral issues, including his "[h]itting, kicking and drawing with a marker on another student," and observed that "he's distracted and he works slowly" and had poor impulse control. (AR 680). However, Carmona also testified that Student's behavior was not a "red flag" that he might need special education "[b]ecause his behavior did not manifest any very intense or very frequent aggression at that point" and he "was doing well in class academically." (AR 686). However, as Carmona explained, staff did decide to refer Student to a general education school counselor "because although the behaviors were infrequent and although the behaviors were not intense, we wanted to provide [an] additional intervention tool that we have for a child in our system. Not every child is referred to special ed. So we wanted to get to know him know what -- how he thinks, how he's wired, whatever, and one of the tools we use is counseling." (AR 702). Carmona affirmatively stated that during the first SST meeting, the team decided not to refer Student for assessment, (AR 711-12), and that although Mother expressed some concerns about the process "taking a long time," everyone agreed to that plan. (AR 724).

However, Mother testified that she "asked for an IEP" for Student at the September 16, 2015 SST meeting. (AR 2583). According to Mother, staff resisted because they said "they wanted to take a few months to get to know him . . . to see for themselves

the behavior, to watch him . . . ." (AR 2584). Mother further testified that Meiron, Student's teacher, stated during the SST meeting that she thought Student should be assessed, but was "overruled." (AR 2585). However, Meiron denied making such a statement, noting that "if [she] thought he should be assessed, [she] would have asked for him to be assessed." (AR 1908). The week after the first SST meeting, Meiron started Student on a specially designed behavior contract to set up a system of rewards with more achievable behavior goals for him than the "regular behavior contract." (AR 1910).

The second SST meeting was held on October 7, 2015. (AR 330-31). Staff reported that Student's behavior was "better in terms of physical contact," but that his "new behavior is spitting in faces" while waiting in line. (AR 330). Staff also reported that Student poked another student in the eye earlier that day while in line. (Id.). The team decided to place Student in a general education social skills/communication group with the school's speech therapist and to refer him to a counselor. (AR 328). However, Carmona testified that Student's behaviors still did not set up a "red flag" that Student might need special education. (AR 741).

A third SST meeting was held on February 8, 2016. (AR 341-42). Meeting minutes reflect that the reason for the meeting was a "Parent request for assessment for special education." (AR 342). Prior to the third SST meeting, school officials had reported several incidents to Mother. For example, on January 27, 2016,

Chambers emailed Mother, stating that "I was very stern with [Student] and relayed the message that he is making my school unsafe by hitting, kicking, et cetera." (AR 2606). Mother stated that upon reading the email, she felt that "finally . . . they're seeing that his behaviors are dangerous, can be dangerous, and that they're violent and that they're aggressive," as she had been attempting to communicate "from the day [she] met with Ms. Chambers." (Id.). Similarly, Mother testified that Carmona and Chambers told her that on February 3, 2016, Student was standing in line, and "suddenly out of nowhere . . . punched the little boy behind him in the crotch." (AR 2608). Mother stated that she became angry upon learning of this incident because she "had been telling them that there were no triggers and nobody would believe [her]." (AR 2609).

The February 8, 2016 SST minutes reflect that Student had "become increasingly aggressive at home and has demonstrated impulsive and aggressive behavior at school (hitting/kicking others)." (AR 342). The minutes further note that Student "has difficulty during unstructured time with his behavior" and had been recently diagnosed by a private psychiatrist hired by Parents, Derrick Ott, with conduct disorder, mood disorder, and disruptive mood dysregulation disorder. (Id.). The minutes conclude, "[d]ue to the recent diagnosis and the increase in behaviors in the last two months, the team feels an assessment for special education is warranted." (Id.).

\\

\\

Carmona specified that it was the combination of the escalation of behaviors and Dr. Ott's diagnosis that led to the decision to assess Student. In response to a question from the ALJ as to whether there was something specific about the diagnosis from Dr. Ott "that basically convinced you that we better assess this child for special education," Carmona responded,

> We have disruptive mood disregulation, mood disorder
> unspecified and the conduct disorder. Conduct disorder
> by itself for Education Code -- for example, for
> emotional disturbance -- is not considered emotional
> disturbance. So you can have a child with conduct
> disorder but he's not eligible for special education.
> But when you have that with emotional components and
> this is now a combination between behavior and emotional
> components that was a reason for -- another reason for
> looking at him for an assessment, yes.

(AR 866). Carmona affirmed that the diagnosis of disruptive mood disregulation disorder was "the part that really concerned [her]." (AR 867). The District provided Mother with an assessment plan on February 10, 2016, which she approved and returned a week later, on February 17, 2016. (AR 343).

Following the third SST meeting, Student began to receive outside behavioral services from the Ventura County Health Department based on a referral by Carmona to Mother. (AR 2609). Additionally, Mother hired a private neuropsychologist, Dr. Mary

Large, to conduct a neuropsychological evaluation of Student. (AR 300 (invoice reflecting Dr. Large's services for March and April 2016)).

At the conclusion of the assessment process, the District held an initial IEP meeting with District staff, Student's Parents, and Dr. Large, who presented her private neuropsychological report. The meeting took place over the course of two days, April 20 and 25, 2016. (AR 436-57). Student was deemed eligible for special education services under the primary qualifying disability of "emotional disturbance" and the secondary qualifying disability of "other health impairment." (AR 436). The IEP provided five areas of special education and related services effective April 26, 2016, including: (1) 30 minutes weekly of specialized academic instruction, (2) 60 minutes weekly of individual counseling, (3) 240 minutes monthly of speech and language therapy, (4) 300 minutes yearly of behavior intervention services, and (5) 90 minutes daily of intensive individualized services. (Id.). Although Parents requested a full-time one-on-one behaviorist aide from a certified non-public agency, the District denied the request on the ground that it "provides paraprofessionals who are trained and supervised by District behaviorists." (AR 455). Parents did not consent to the IEP at that time.

Also on April 25, 2016, the District provided Parents with a follow-up Assessment Plan, reflecting the District's intention to evaluate Student's needs for intensive social emotional services ("ISES"), occupational therapy, and increased aide support beyond

15

that offered in the IEP. (AR 461). The follow-up Assessment Plan also proposed that the District conduct a functional behavior analysis ("FBA"). (Id.). Mother signed the form that day, but did not check the box affirming her full consent to the plan. (Id.). On May 2, 2016, Carmona emailed Mother to follow up on Parent's "consent or lack thereof to the proposed assessment plan," but Parents did not respond. (AR 469). On May 27, 2016, the District sent Parents a letter summarizing Student's educational program to date, and reminding Parents that they still had not provided their consent to the follow-up Assessment Plan. The letter enclosed an additional copy of the plan. (AR 468).

Mother signed and returned the follow-up Assessment Plan just prior to the end of the school year. (AR 462). However, Parents did not consent to the IEP until August 24, 2016, just before the start of the new school year. (AR 458-60, 555, 2681). Student continued to attend Madroña Elementary School for first grade and was assigned to the classroom of Karen Tokin. The behavioral interventions specified in the April IEP were implemented. Tokin testified that Student was progressing academically and that his behaviors were "not more severe than anybody else's in [her] class" (AR 2481) and that on "most days," Student "was earning more [positive behavior] stickers than [she] could keep up with on the rewarding." (AR 2474). Tokin further testified that Student did not need "one-on-one aide support" in her classroom because she could "handle it," and that he did not pose a safety risk in the classroom. (AR 2523).

Pursuant to the District's aide assessment report, dated September 8, 2016, Student did not require an increase in aide services beyond the one-to-one adult support during unstructured times provided for in the April 2016 IEP. (AR 494-96). According to the report, with the implementation of Student's IEP goals, (AR 494), Student "was compliant, attentive, involved, and cooperative" in the classroom; during lunch and recess he required intervention "very infrequently" and behaved in a "socially appropriate" manner; and overall "was demonstrating appropriate behaviors" both in and outside the classroom. (AR 495).

Student also received a Functional Behavioral Assessment in September 2016. School Behavior Interventionist Specialist Megan Henderson drafted the FBA report, which was dated September 20, 2016. Henderson noted at the outset that Student "was referred for a Functional Behavioral Assessment (FBA) by the IEP team in April 2016. Due to a delay in acquiring a signed assessment plan, the FBA was not initiated until September 2016." (AR 487). The Report concluded that teaching and paraprofessional staff should continue the behavioral strategies they were implementing pursuant to the IEP, but that "due to the low frequency, intensity, and duration of behaviors observed during the course of the assessment," no behavior intervention plan was recommended. (AR 492-93).

Student received a second IEP on October 6, 2016. (AR 509). The IEP explicitly notes that the annual "[g]oals continue from 4/20/16 IEP." (Id.). The October 2016 IEP changed the 60 minutes

of counseling that Student received per week in the April 2016 IEP from "individual counseling" to "ISES counseling" and included 90 minutes per month of social work support. (D Br. at 18 n.4). Mother signed the IEP with the following addendum: "I don't believe this IEP offers or provides a free and appropriate public education to [Student] and I reserve all rights with regard to it. In the meantime, I hereby request and instruct the District to implement the IEP in full." (AR 510). In an email dated October 16, 2016 from Tokin to Chambers, Tokin reported that Student was "cooperative and focused on learning," and although he continued to engage in "attention seeking behaviors," Tokin controlled the incidents without negative reactions from Student. (AR 524). On October 18, 2016, Tokin also reported to Chambers that she heard "the sweetest exchange between [Student] and a girl at his table. They are complimenting each other's work and sharing crayons, using words like 'please' and 'thank you.' It is delightful!" (AR 525).

## IV.

## THE ALJ'S DECISION

Plaintiffs filed an administrative due process complaint on March 17, 2016, i.e., after the District had provided Parents with an Assessment Plan on February 10, 2016, but before the April 2016 IEP meetings were held. (AR 540). As amended, Plaintiffs' complaint raised the same seven questions for each of two periods, the first from April 26, 2015 (the date Mother returned the health history form omitting information about Student's behavioral and mental issues) through February 10, 2016 (the date the District

offered Mother an Assessment Plan), and the second from February 11, 2016 through the end of the 2016 extended school year. Specifically, Plaintiffs asked the OAH to resolve whether, for each of those two periods, the District denied Student a FAPE by failing to:

    a.   meet its "child find" obligations with respect to Student;

    b.   assess Student in all areas of suspected disability;

    c.   find Student eligible for special education and related services;

    d.   offer and provide measurable goals and appropriate present levels of performance in all areas of need;

    e.   offer and provide appropriate placement and services, including appropriate accommodations and modifications, speech and language services, occupational therapy, behavioral interventions, psychotherapy, social skills, and extended school year services;

    f.   offer and provide Parents training addressing Student's behavioral and emotional difficulties; and

    g.   make a "formal, specific" offer of [a free appropriate public education ("FAPE")].

(AR 541-42).

The ALJ heard testimony over the course of seven days in November 2016: November 2-3 (school psychiatrist Carmona (AR 649-1187)); November 8 (private neuropsychologist Dr. Large (AR 1204-1458)); November 9 (re-direct and re-cross of Carmona (AR 1501-1631), and principal Chambers (AR 1632-1857)); November 10 (kindergarten teacher Meiron (AR 1872-2117), and school speech pathologist Caitlin Templeman (AR 2120-2181)); November 17 (school behavior intervention specialist and author of September 2016 FBA report Henderson (AR 2209-2314), special education teacher Noelle Jordan (AR 2315-2390), behavioral health clinician Caren Jinich (AR 2391-2425), behavioral health clinician-individual therapist Lorena Rojas (AR 2426-2457), and first grade teacher Tokin (AR 2457-2537)); and, finally, November 29 (Mother (AR 2549-2754)). The ALJ broadly summarized her conclusions in the Decision as follows:

> Mother had informed District of Student's history of social, emotional and behavioral difficulties when he started kindergarten. District failed to timely assess Student after Mother first requested he be assessed for special education eligibility at an initial Student Study Team meeting on September 16, 2015. Instead of promptly assessing Student, District held two more Student Study Team meetings and attempted to address Student's social, emotional and behavioral deficits with interventions in the general education curriculum over the next four and one-half months. District eventually

assessed Student, found him eligible for special
education and offered him a FAPE in the April 2016 IEP.

District denied Student a FAPE for four and one-half
months due to its delay in assessing Student. However,
Student did not establish that District failed to offer
him a FAPE in the April 2016 IEP. Student proved that
when District eventually assessed him, it failed to
assess him in all areas of suspected disability by
failing to timely administer a functional behavior
assessment to him, even though his negative behavior was
his primary suspected area of disability. Student
failed to establish that District should have assessed
him prior to Mother's request for an assessment on
September 16, 201[5]. Student is awarded remedies of
compensatory education and training for District
personnel in the area of assessment obligations under
the IDEA and functional behavior assessments.

(AR 542).

Specifically, the ALJ concluded that District failed to meet
its "child find" obligations between September 16, 2015, the date
of the first SST Meeting, through April 19, 2016, the day before
the first IEP Meeting. (AR 563). However, the ALJ determined that
the District was not required to assess Student prior to Mother's
request for an assessment on September 16, 2015. (AR 562). The
ALJ further determined that District failed to assess Student in

all areas of suspected disability between September 16, 2015 and the end of the 2016 extended school year due to its failure to provide a functional behavior assessment. (AR 563-64). Finally, due to the District's failure to act on Mother's request for an assessment at the September 16, 2015 SST meeting, which would have also triggered an IEP deadline four and a half months sooner than the date Student's IEP was actually provided, the ALJ found that District failed to find Student eligible for special education, provide measureable goals and appropriate levels of performance, provide appropriate placement and services, and make a formal, specific FAPE offer between December 1, 2015, the date when an IEP would have been due had District promptly acted on its duty to assess, and April 19, 2016. (AR 574).

However, the ALJ also found that the District fulfilled its obligation to offer Student a FAPE as of the April 20, 2016 IEP. (AR 542). Finally, with respect to Plaintiffs' claim that District should have provided parent training, the ALJ concluded that District personnel and Mother "frequently communicated about Student's behaviors, strategies used at school and consequences" such that parent training was not "necessary to create consistency between strategies used at school and at home." (AR 571-72).

The ALJ's remedial order required the District to compensate Student for the services he would have otherwise received between December 1, 2015 and April 20, 2016, and to reimburse Plaintiffs for Dr. Large's services. (AR 576). The ALJ further ordered the District to provide "at least two hours of special education

training to the special education administrative, teaching, and other professional personnel . . . in the area of the obligations under the IDEA to refer pupils for assessment for special education in all areas of suspected disabilities, and in the area of functional behavior assessments." (Id.). However, because "Student failed to establish that Dr. Aucoin's and Dr. Ott's services were reasonably necessary for Student to access his education at the times at issue in this proceeding," the ALJ determined that "Student is not entitled to reimbursement for out of pocket costs for their services."[2] (AR 575).

## V.

## THE PARTIES' CONTENTIONS

Although the Complaint broadly asserts that Plaintiffs are seeking "this Court's review and reversal of the Decision with respect to those issues in which Plaintiffs did not prevail," (Complaint ¶ 10), Plaintiffs' brief does not challenge all of the ALJ's adverse decisions, but focuses instead on four primary claims. First, Plaintiffs contend that the District's "child find" obligations arose when Mother met with Principal Chambers on August 25, 2015, the day before kindergarten started, and not, as the ALJ

---

[2] Student and Parents participated in family therapy with psychologist Dr. Andrea Aucoin in the summer of 2015, before Student started kindergarten, to address Student's aggressive behaviors at home. At the September 16, 2015 SST meeting, Parents told the team that Student was seeing Dr. Aucoin, who had opined that Student may have a mental disorder, but that such a disorder was difficult to diagnose due to Student's young age. (AR 545). Plaintiffs do not seek reimbursement for costs related to Dr. Aucoin in this action.

found, when Mother requested an IEP at the first SST Meeting on September 16, 2015.[3]  (P Br. at 2, 4-7).  Second, Plaintiffs challenge the ALJ's finding that the April 2016 IEP adequately provided Student a FAPE because the District had not yet assessed Student in all areas of disability by that point.  (P Br. at 7-11).  According to Plaintiffs, the District's failure to timely administer a functional behavior assessment was a fatal procedural flaw that "made it impossible to develop a substantively appropriate IEP," and therefore "constituted a denial of FAPE for the period from April 20, 2016 through the end of the 2016 [school year]."  (P Opp. at 5).

Third, Plaintiffs maintain that, apart from the failure to administer an FBA prior to the April 2016 IEP, Defendant's assessment of Student was also inadequate due to: (1) the psychologist's use of assessment instruments for purposes for which they were not valid and reliable, and her failure to administer an assessment instrument in accordance with the producer's instructions, (P Br. at 11-13); (2) Defendant's failure to properly assess Student's emotional difficulties, despite the recognition

---

[3] Plaintiffs claimed in the administrative proceeding that Defendant's "child find" obligations were triggered even earlier, on April 26, 2015, when Mother submitted a District Permanent Health History about Student that contained concededly inaccurate information. Plaintiffs appear to have renewed that claim in the instant Complaint. (See, e.g., Complaint ¶ 9). However, in their brief, Plaintiffs explicitly reduced the scope of their original contention and alleged that Defendant's "child find" obligations arose on August 25, 2015, when Mother met with Chambers before the start of Student's kindergarten school year, approximately three weeks earlier than the ALJ had found. (See P Br. at 4 n.6 ("Plaintiffs do not contend that the District violated its 'child find' duties from April 26, 2015 through August 24, 2015.")).

24

that further evaluation was required, (id. at 13-14); and (3) Defendant's failure to review all existing data in connection with its assessment. (Id. at 14-15). Fourth, Plaintiffs contend that the remedies ordered by the ALJ are inadequate because: (1) the compensatory remedies cover only the four and a half-month period between December 1, 2015 and April 20, 2016, instead of the entire period during which the ALJ determined that District failed to comply with at least some portion of the IDEA; used a "cookie cutter" approach as to the frequency and scope of the compensatory remedies ordered; and failed to include any behavioral aide services at all, (P Br. at 16-18); (2) the compensatory remedies did not incorporate all of Dr. Large's "uncontradicted testimony regarding appropriate compensatory services," (id. at 18-23); and (3) the monetary remedies did not include reimbursement in the amount of $700 for the services of Dr. Ott, the psychiatrist who diagnosed Student with ADHD in early February 2016. (Id. at 23).

In addition to the remedies ordered by the ALJ, Plaintiffs seek: "(a) compensatory education services as follows: 200-250 hours of behavioral intervention services by a behavioral aide, 100 hours of intensive social emotional service, 50-70 hours of speech and language services to address social interaction; and 50 hours of parent training; these services to be implemented at the time and place of plaintiffs' choosing; (b) reimbursement in the amount of $700 for Dr. Ott's services; and (c) attorneys fees as the prevailing parties, pursuant to a subsequently filed motion for attorneys fees." (Id. at 24).

In opposition, Defendant contends that the ALJ correctly concluded that its "child find" obligations arose, at the earliest, on September 16, 2015, because the District was entitled to a "reasonable time" after the start of the school year to determine whether Student should properly be referred for special education assessment. (D Br. at 10-13). Additionally, Defendant maintains that the April 2016 IEP was reasonably calculated to provide Student a FAPE, as it incorporated recommendations from both the District's reports and Dr. Large's report, (id. at 14-17), and has been proven successful by its implementation during Student's first grade year. (Id. at 17-18). Finally, Defendant states that the remedies ordered were appropriate, and notes that even though the ALJ determined that Defendant should have conducted a functional behavior assessment earlier, the failure to do so was harmless error because when the assessment was eventually performed, "it resulted in no change to [Student's] educational program." (Id. at 18).

## VI.

### STANDARD OF REVIEW

An action under the IDEA "is in substance an appeal from an administrative determination, not a summary judgment." Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995) (noting that IDEA proceedings in federal court "[do] not fit well into any pigeonhole of the Federal Rules of Civil Procedure"). The district court must "read the administrative record, consider the new evidence, and make an independent judgment based on a

preponderance of evidence . . . giving due weight to the hearing officer's determinations." _Id._; _see also_ L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 908 (2009) ("Although the district court is free to determine independently how much weight to give the administrative findings, the courts are not permitted simply to ignore them.") (internal quotation marks and brackets omitted); M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist., 858 F.3d 1189, 1195 n.1 (9th Cir. 2017) ("[T]he district judge must actually examine the record to determine whether it supports the ALJ's opinion."). In exercising their power of independent review, "courts must not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 817 (9th Cir. 2007) (quoting Rowley, 458 U.S. at 206).

The Ninth Circuit has more recently addressed the issue of deference to underlying administrative decisions in IDEA proceedings as follows:

> In IDEA cases, unlike other cases reviewing administrative action, we do not employ a highly deferential standard of review. [Amanda J., 267 F.3d at 887]. Nevertheless, complete de novo review "is inappropriate." _Id._ We give "due weight" to the state administrative proceedings. Van Duyn, 502 F.3d at 817. "[T]he fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach

appropriate." <u>Hood v. Encinitas Union Sch. Dist.</u>, 486
F.3d 1099, 1104 n.4 (9th Cir. 2007). We give particular
deference to "thorough and careful" administrative
findings. <u>R.B. ex rel. F.B. v. Napa Valley Unified Sch.
Dist.</u>, 496 F.3d 932, 937 (9th Cir. 2007) (internal
quotation marks and citation omitted).

<u>J.G. v. Douglas Cnty. Sch. Dist.</u>, 552 F.3d 786, 793 (9th Cir.
2008); <u>Wartenberg</u>, 59 F.3d at 892 (where a hearing officer's
report is "especially careful and thorough," the court may
appropriately exercise its discretion to give the report "quite
substantial deference"). A court will "treat a hearing officer's
findings as 'thorough and careful' when the officer participates
in the questioning of witnesses and writes a decision 'contain[ing]
a complete factual background as well as a discrete analysis
supporting the ultimate conclusions.'" <u>R.B.</u>, 496 F.3d at 942
(quoting <u>Park v. Anaheim Union High Sch. Dist.</u>, 464 F.3d 1025, 1031
(9th Cir. 2006) (per curiam)); <u>see also</u> <u>Cnty. of San Diego v.
California Special Educ. Hearing Office</u>, 93 F.3d 1458, 1466-67 (9th
Cir. 1996) ("This circuit gives the state hearing officer's
decision 'substantial weight' when it 'evinces his careful,
impartial consideration of all the evidence and demonstrates his
sensitivity to the complexity of the issues presented.'") (quoting
<u>Ojai Unified Sch. Dist.</u>, 4 F.3d at 1476). "[A]t a minimum," the
court "must consider the [ALJ's] findings carefully." <u>R.B.</u>, 496
F.3d at 937 (internal quotation marks and citation omitted).
\\
\\

1    "In an action for judicial review of an administrative
2    decision [under the IDEA], the burden of persuasion rests with the
3    party challenging the ALJ's decision." L.M., 556 F.3d at 910.
4    Here, the Court finds that the ALJ's thirty-nine page Decision was
5    thorough and careful. See id. at 908 (finding that the ALJ's
6    "twenty-page Opinion certainly meets [the careful and thorough]
7    standard in our judgment").  The Decision includes a lengthy,
8    detailed summary of the relevant facts, (AR 542-557), comprehensive
9    discussions of the applicable statutory and case law, (see
10   generally AR 557-572), and generally thoughtful, finely-tuned
11   applications of the law to the facts. (Id.).  Accordingly, except
12   as noted, the ALJ's Decision here warrants substantial deference.

13

14                                VII.

15                             DISCUSSION

16

17   A.    Commencement Of The District's "Child Find" Obligations

18

19        Plaintiffs contend that the District's "child find"
20   obligations arose when Mother met with Principal Chambers on August
21   25, 2015, the day before kindergarten started, and not, as the ALJ
22   found, when Mother purportedly first requested an IEP at the first
23   SST Meeting on September 16, 2015.  (P Br. at 2, 4-7).  According
24   to Plaintiffs, the ALJ's factual finding is incorrect because
25   Mother requested an IEP when she met with Chambers in August.  (Id.
26   at 5).  Plaintiffs further contend that even if Mother did not
27   expressly request an IEP at that meeting, "the information [Mother]
28   provided to Ms. Chambers at the August 25th meeting was . . .

29

sufficient to trigger the District's duty to assess." (Id. at 5).
This claim is DENIED.

    The Parties presented conflicting evidence as to the substance
of the August 25, 2015 meeting between Mother and Chambers.  Mother
testified that she had several reasons for arranging to meet with
Chambers before school started.  According to Mother, her primary
reason was to give Chambers "a heads up.  [Student's] behavior had
become increasingly more challenging and, as I said, more violent,
and I felt that she needed to be aware of some of the things that
we were going through as well as his history, mostly for the safety
of the other children."  (AR 2552).  Mother also testified, only
in response to a question from the ALJ, that she asked for an IEP
at during the meeting.  (See AR 2553) ("[ALJ]:  Did you tell Ms.
Chambers you wanted an IEP?  [Mother]:  Yes.  [ALJ]:  You did at
this meeting?  [Mother]:  Yes, I did.").

    In contrast, Chambers testified in great detail about what
transpired at the meeting, (AR 1646, 1653-60), which she expressly
maintained did not include a request for an IEP.  (AR 1658).
Furthermore, Chambers' account of the meeting was memorialized in
a contemporaneous email sent at 6:08 p.m. on August 25, 2015, which
Chambers represented was a "summary of [her] discussion with
[Student's] mom."  (AR 1654).  That email reads, in relevant part,

        I met with [Mother] today . . . . [Student] is an
        incoming kindergartener who is in Pam Meiron's class.
        [Student] was adopted and there is a history of bipolar

and other mental health disorders in his family.  Mom
shared that [Student] has been working with a
behaviorist, had a "shadow" at his preschool, and
received private speech therapy for disfluency.  He has
also received PT for low muscle tone in the past but
this has improved.  [Student] exhibits aggressive
behaviors (hitting/punching).  Mom reported that his
behavior improved last year; he had an amazing preschool
teacher.  The behaviors did regress during the summer
while in camp.  [Student] and his parents are seeing a
private psych as well (I have her card and she is willing
to come to meetings).  There is not a diagnosis as of
yet.  Mom is going to look for any information or reports
that she may have and provide us with copies.  Mom seems
very supportive and wants to be kept in the loop.  She
is going to fill out a release form for us to talk to
the psych.

Pam, I am happy to sit down and discuss more with you
but wanted to give you a heads up on what I learned
today.

I would like to set up an SST for [Student].  I know
that normally we wait for a bit to get to know the
students (especially in K) but I think it is important
that we communicate.

(AR 348).

1    Chambers also affirmatively testified that Mother did not
2    request an IEP during that meeting:

3

4         Q.    You don't recall in this conversation [Student's]
5               mother asking you for an IEP?
6         A.    She did not ask me for an IEP.
7         Q.    You recall that she didn't?
8         A.    If she had, then we would have had a timeline and
9               we would have addressed her request.

10

11   (AR 1658).

12

13       Although the ALJ acknowledged that Mother disclosed Student's
14   behavioral problems to Chambers for the first time on August 25,
15   2015, she concluded that the District's "Child Find" obligations
16   to propose an assessment did not arise until three weeks later, at
17   the first SST meeting.  (AR 562-563).  The ALJ explained:

18

19       Mother first informed District of Student's behavioral
20       difficulties at her meeting with Ms. Chambers on August
21       2[5], 2015.  Ms. Chambers responded to this information
22       reasonably by immediately alerting the Madroña Study
23       Team members and Ms. Meiron of the information Mother
24       had provided about Student and by setting up a Study
25       Team meeting for September 16, 2015.  Ms. Chambers
26       promptly instructed them to pay attention to Student's
27       behavior and be ready to discuss him at the Study Team
28       meeting.  Student's first day at Madroña was August 2[6],

2015, when he started kindergarten. Student exhibited
a few negative behaviors in his first few weeks of
kindergarten. However, District was entitled to a
reasonable amount of time to elapse after these
behaviors occurred before it referred Student for an
assessment for special education. Therefore, District
did not breach its child find and duty to assess
obligation to Student from April 26, 2015 through
September 15, 2015.

(AR 562).

"Child-find requires school districts to develop a method to
identify, locate, and evaluate students with disabilities who are
in need of special education services." Beauchamp v. Anaheim Union
High Sch. Dist., 816 F.3d 1216, 1221 (9th Cir. 2016). "[C]laims
based on a local educational agency's failure to meet the 'child
find' requirement are cognizable under the IDEA." Compton Unified
Sch. Dist. v. Addison, 598 F.3d 1181, 1185 (9th Cir. 2010). The
Ninth Circuit instructs that a duty to evaluate arises when a
disability is deemed "suspected":

[A] disability is "suspected," and therefore must be
assessed by a school district, when the district has
notice that the child has displayed symptoms of that
disability. In Pasatiempo by Pasatiempo v. Aizawa, 103
F.3d 796 (9th Cir. 1996), for example, we held that the
"informed suspicions of parents, who may have consulted

outside experts," trigger the requirement to assess, even if the school district disagrees with the parent's suspicions because "[t]he identification [and assessment] of children who have disabilities should be a cooperative and consultative process." Id. at 802. Once either the school district or the parents suspect disability, we held, a test must be performed so that parents can "receive notification of, and have the opportunity to contest, conclusions regarding their children." Id.

Timothy O. v. Paso Robles Unified Sch. Dist., 822 F.3d 1105, 1119–20 (9th Cir. 2016), cert. denied, 137 S. Ct. 1578 (2017); see also J.K. v. Missoula Cnty. Pub. Sch., 713 F. App'x 666, 667 (9th Cir. 2018) ("The duty to evaluate a student arises when disability is 'suspected,' or 'when the district has notice that the child has displayed symptoms of that disability.'") (quoting Timothy O., 822 F.3d at 1119); S.B. v. San Mateo Foster City Sch. Dist., 2017 WL 4856868, at *13 (N.D. Cal. April 11, 2017) ("A school district's child find duty is triggered when it has reason to suspect a child has a disability, and reason to suspect the child may need special education services to address that disability.") (citing Dep't of Educ. v. Cari Rae S., 158 F. Supp. 2d 1190, 1194 (D. Haw. 2001)). Whether a school district had reason to suspect that a child might have a disability must be evaluated in light of the information the district knew, or had reason to know, at the relevant time, not "'exclusively in hindsight.'" Adams v. State of Oregon, 195 F.3d 1141, 1149 (9th Cir. 1999) (quoting Fuhrmann v. East Hanover

Bd. of Educ., 993 F.2d 1031, 1041 (3d Cir. 1993)). However, some consideration of subsequent events may be permissible if the additional data "provide[s] significant insight into the child's condition, and the reasonableness of the school district's action, at the earlier date." E.M. v. Pajaro Valley Unified Sch. Dist., 652 F.3d 999, 1006 (9th Cir. 2011) (quoting Adams, 195 F.3d at 1149).

Plaintiffs summarily contend that the ALJ was factually mistaken in finding that Mother did not request an IEP until September 16, 2015 because Mother allegedly did so during her August 25, 2015 meeting with Chambers. While Mother testified in response to the ALJ's (not her counsel's) questions that she requested an IEP at the August 25 meeting, the testimony was isolated and unsupported by any factual detail. In contrast, Chambers testified in great detail about what occurred at the meeting, (AR 1646, 1653-60), and memorialized the substance of the discussion in an email that same day. (AR 348). Chambers further testified that if Mother had requested an IEP during the meeting, she would have followed the relevant IDEA deadlines. (AR 1658). Plaintiffs have not shown by a preponderance of the evidence that Mother expressly requested an IEP at her initial meeting with Chambers on August 25, 2015.

Defendant's "child find" liability for the three-week period between August 25 and September 16, 2015 that Plaintiffs have put at issue here therefore turns on whether Mother's representations during the August 25 meeting triggered, as a matter of law, a duty

35

on Defendant's part to conduct an <u>immediate</u> assessment of Student. Plaintiffs contend that Defendant violated its child find obligations by promptly assembling an SST and scheduling a team meeting for three weeks later instead of initiating a full assessment. The Court disagrees.

Here, Chambers assembled an SST the very day she met with Mother on August 25. The first SST meeting, scheduled for September 16, 2015, reasonably provided Defendant a brief window to observe Student's behavior before making a decision about Student's potential need for general education interventions or a special education assessment. This brief window was all the more reasonable because Student, as a five-year-old kindergarten student, could be expected to experience some emotional or behavioral difficulties in making the transition to a new school, and it does not appear that as of August 25, 2015 anyone at Madroña had ever even seen Student. Furthermore, as memorialized in Chambers' email, Mother admitted during the meeting that despite his purported history of behavioral problems, Student had not been diagnosed with a disability. (AR 348). While Chambers appears to have taken Mother's representations seriously, it must also be remembered that Mother misled Defendant by failing to expressly reveal Student's behavioral history in the school forms she had submitted earlier that Spring and apparently did not even bring any materials documenting Student's prior behavior with her to the August 25 meeting. Mother admitted that she did not tell the District about Student's history earlier because she did not know how he would behave in a new school and did not want the District

to prejudge him. (AR 2703). Therefore, Defendant could reasonably question whether Mother's representations reflected truly "informed suspicions" about Student's potential disability sufficient to call for an immediate assessment. <u>Timothy O.</u>, 822 F.3d at 1119 (quoting <u>Pasatiempo</u>, 103 F.3d at 802).

The District acted reasonably upon learning of Student's behavioral problems on August 25, 2015 by assembling an SST and scheduling a meeting in the coming weeks. The Court agrees with the ALJ's finding that the District's "Child Find" obligation did not arise until the September 16, 2015 SST meeting. Accordingly, Plaintiffs' "child find" claim is DENIED.

**B.** **<u>The Impact Of The District's Failure To Complete A Functional Behavior Assessment On The Validity Of The April 2016 IEP</u>**

According to Plaintiffs, the ALJ correctly found that the failure to complete a Functional Behavior Assessment violated the District's obligation to "assess Student in all areas of suspected disability" from September 16, 2015, the date of the first SST meeting, through the end of the 2016 school year, and impeded Parents from meaningfully participating in the IEP process. However, contrary to the ALJ, Plaintiffs maintain that this failure constituted a "fatal procedural violation of the IDEA" that necessarily invalidated the April 2016 IEP, without regard to the contents of the IEP or whether it was actually effective. (P Br. at 2; <u>see also</u> <u>id.</u> at 7-11). As discussed below, the ALJ's Decision appears to reach competing conclusions as to whether Defendant's

failure to conduct an FBA effectively denied Student a FAPE from December 1, 2015 through the end of the 2015-2016 school year. In light of this tension, the Court will defer to the ALJ's explicit finding that "the District's delay in administering a functional behavior assessment to Student constitute[d] a denial of FAPE for the period from April 20, 2016 through the end of the 2016 extended school year," and reverses any finding that Defendant offered Student a FAPE in the April 2016 IEP. (AR 565).

"Under the IDEA, the school district must conduct a 'full and individual initial evaluation,' one which ensures that the child is assessed in 'all areas of suspected disability,' before providing that child with any special education services." Timothy O., 822 F.3d at 1119 (quoting 20 U.S.C. §§ 1414(a)(1)(A), 1414(b)(3)(B)). "[T]his requirement serves a critical purpose: it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child." Timothy O., 822 F.3d at 1119.

"School districts may deny a child a free appropriate public education by violating either the substantive or procedural requirements of the IDEA." Id. at 1118 (citing M.M. v. Lafayette Sch. Dist., 767 F.3d 842, 852 (9th Cir. 2014)).

A school district denies a child a free appropriate public education by violating the IDEA's substantive

requirements when it offers a child an IEP that is not reasonably calculated to enable the child to receive educational benefits. J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 626 F.3d 431, 432–33 (9th Cir. 2010). The school district may also, however, deny the child a free appropriate public education by failing to comply with the IDEA's extensive and carefully drafted procedures. See Doug C. v. Hawaii Dep't of Educ., 720 F.3d 1038, 1043 (9th Cir. 2013). While some procedural violations can be harmless, procedural violations that substantially interfere with the parents' opportunity to participate in the IEP formulation process, result in the loss of educational opportunity, or actually cause a deprivation of educational benefits "clearly result in the denial of a [free appropriate public education.]" Amanda J., 267 F.3d at 892.

Timothy O., 822 F.3d at 1118 (emphasis added).

A loss of an educational opportunity occurs "when there is a 'strong likelihood' that, but for the procedural error, an alternative placement 'would have been better considered.'" Id. at 1124 (quoting Doug C., 720 F.3d at 1047). However, "to succeed on a claim that a child was denied a free appropriate public education because of a procedural error, the individual need not definitively show that his educational placement would have been different without the error." Timothy O., 822 F.3d at 1124 (emphasis added).

The ALJ found that as of the September 16, 2015 SST meeting, the District was on notice that "Student's behavior was a suspected area of his disability." (AR 565). As such, the ALJ explained, the "District reasonably should have anticipated that results of a functional behavior assessment might be needed to develop effective behavior strategies for Student. Therefore, District should have included a functional behavior assessment in the untimely proposed assessment plan District gave to Mother on February 10, 2016." (Id.).

The ALJ also addressed the harm that resulted from the failure to administer the assessment:

> If District had included a functional behavior assessment in the battery of assessments it administered to Student in spring 2016, the IEP team would likely have had valuable information about Student's behavior patterns and antecedents to his aggressive behaviors. The absence of results, findings and recommendations from a functional behavior assessment at the April 2016 IEP meeting impeded Parents' opportunity to participate in the decision making process regarding the provision of FAPE to Student.
>
> When District eventually administered a functional behavior assessment to Student in September 2016, Ms. Henderson concluded that staff should continue to implement behavioral strategies which were already being

used with Student, including reinforcement with "token economy" and redirection. Ms. Henderson's report did not recommend that Student have a behavior intervention plan because his observed negative behaviors occurred infrequently at school, and were low in intensity and brief in duration. If District had administered a functional behavior assessment to Student earlier, District and Parents would have had the results and recommendations from it by the April 2016 IEP meeting. This material information would have assisted Parents in deciding what services Student reasonably needed in order to access his education. Therefore, District's failure to administer a functional behavior assessment to Student until September 2016, significantly impeded Parent's [sic] opportunity to participate in the decision making process regarding the provision of FAPE to Student between April 20, 2016 through the end of the 2016 extended school year. Consequently, District's delay in administering a functional behavior assessment to Student constitutes a denial of FAPE for the period from April 20, 2016 through the end of the 2016 extended school year.

(AR 565) (emphasis added).

Despite the ALJ's explicit finding that the failure to assess Student in all areas of suspected disability constituted a denial of FAPE due to the significant impediment that it posed to Parents'

ability to participate in the IEP process, the ALJ elsewhere found
that "Student did not establish that District failed to offer him
a FAPE in the April 2016 IEP" and in fact affirmatively asserted
that Defendant "offered [Student] a FAPE in the April 2016 IEP."
(AR 542).  Specifically, the ALJ determined that the April 2016
IEP properly found Student eligible for special education and
related services, (AR 567); offered and provided measurable goals
and appropriate levels of present performance, (AR 569); offered
and provided "placement, services, accommodations and/or
modifications that [Student] needed to access his education and
receive educational benefit, (AR 571); and constituted a formal,
specific offer of a FAPE.  (AR 573).  Accordingly, the ALJ appears
to have implicitly found that the April 2016 IEP was substantively
sufficient despite any procedural errors.  The question, then, is
whether the procedural violation was sufficiently serious to
undermine what the ALJ otherwise found to be a substantively
adequate IEP, and if so, what the proper remedy should be.

    Plaintiffs argue that the failure to conduct an FBA
constituted "such a[n] infringement of parent participation in the
IEP process" that "an appropriate IEP definitionally could not be
created."  (P Br. at 10).  This "definitional" argument seems to
suggest that some procedural errors are structural defects that
simply cannot be overcome, an approach that the Ninth Circuit has
pointedly rejected in this context:

        Not all procedural flaws result in the denial of a FAPE.
        We have never adopted as precedent the structural defect

approach discussed by Judge Alarcon in <u>M.L. v. Federal</u> <u>Way School District</u>, 394 F.3d 634 (9th Cir. 2005) (plurality). Our precedent is clear: a procedural violation may be harmless, and we must consider whether the procedural error <u>either</u> resulted in a loss of educational opportunity <u>or</u> significantly restricted parental participation.

<u>L.M.</u>, 556 F.3d at 910 (emphasis added). In <u>L.M.</u>, for example, the lower court had concluded that the school district's strict limitation on the amount of time that parents' expert could observe student was a "structural" error that deprived parents of "their right to 'meaningfully participate in the IEP process.'" <u>Id.</u> The Ninth Circuit reversed the district court's finding as "clearly erroneous" because the court "neglected to consider whether Parents' right was <u>significantly affected</u> by the District's procedural violation," and no evidence in the record appeared to support such a finding. <u>Id.</u> Accordingly, even procedural errors that restrict parental participation in the IEP process are subject to harmless error analysis. <u>Id.</u> at 910-11.

The cases upon which Plaintiffs rely for the proposition that "an appropriate IEP definitionally [sic] could not be created without the required parental participation" are not entirely controlling here, as the facts are slightly different. (P Br. at 10). In those cases, the procedural violation actually foreclosed development of an appropriate, substantively effective IEP. In <u>Timothy O.</u>, for example, the Ninth Circuit found that the school

district's complete failure to test an autistic student for autism "deprived his IEP Team of critical evaluative information about his developmental abilities as an autistic child.  That deprivation made it _impossible_ for the IEP Team to consider and recommend appropriate services necessary to address [student's] unique needs, thus depriving him of critical educational opportunities and substantially impairing his parents' ability to fully participate in the collaborative IEP process."  Timothy O., 822 F.3d at 1119 (emphasis added).

Similarly, in Amanda J., which also concerned an autistic student, the school district wrongfully withheld critical information from student's parents, thereby depriving them of the opportunity to meaningfully participate in the IEP process.  The court explained:

> This is a situation where the District had information
> in its records, which, if disclosed, would have changed
> the educational approach used for [student], increasing
> the amount of individualized speech therapy and possibly
> beginning the D.T.T. program much sooner.  This is a
> particularly troubling violation, where, as here, the
> parents had no other source of information available to
> them.  No one will ever know the extent to which this
> failure to act upon early detection of the possibility
> of autism has seriously impaired [student's] ability to
> fully develop the skills to receive education and to
> fully participate as a member of the community.

Amanda J., 267 F.3d at 893-94; see also N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula Cnty., Mont., 541 F.3d 1202, 1210 (9th Cir. 2008) ("[W]ithout evaluative information that [student] has autism spectrum disorder, it was not possible for the IEP team to develop a plan reasonably calculated to provide [student] with a meaningful educational benefit throughout the 2003-04 school year."); L.J., 850 F.3d at 1008 ("[T]here is reason to believe that alternative services would have at least been more seriously considered during the IEP process if the School District had assessed [student's] health . . . . Because his health and the impacts of his medication were never assessed, no matter what assistance [student] received, the School District would remain unable to appropriately address those needs.").[4]

Here, the record suggests that the April 2016 IEP had a positive impact once it was implemented at the start of Student's

---

[4] The remaining cases cited by Plaintiffs involved IEPs that were developed without any participation at all by the student's parents or other key persons with knowledge, which is not the case here. See Doug C., 720 F.3d at 1043 (district's decision to hold IEP meeting without parent even though parent expressed a willingness to participate and merely asked to reschedule constituted denial of FAPE); Shapiro v. Paradise Valley Unified Sch. Dist., 317 F.3d 1072, 1079 (9th Cir. 2003), superseded by statute on other grounds (district's failure to include student's parents and a representative of the school for the deaf that student had been attending in IEP meeting resulted in loss of educational opportunity and denial of FAPE); M.L., 394 F.3d at 646 (failure to include regular education teacher on IEP team deprived student of FAPE because "we have no way of determining whether the IEP team would have developed a different program after considering the views of a regular education teacher"); W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23, 960 F.2d 1479, 1484 (9th Cir. 1992), superseded by statute on other grounds (failure to include student's teacher in IEP and to develop a "complete IEP" denied student a FAPE).

first grade year, even if Student's IEP was modified somewhat in his October 2016 IEP.[5]  For example, Henderson, who conducted the FBA in the fall of 2016, observed that Student "responded well to directions in the classroom," (AR 2273), and that his behavior on the playground was "very appropriate.  He stayed in line, he took his turn, there was no issue during that outside observation."  (AR 2274).  Henderson also noted that the "few times" she saw an incident in which Student was touching a peer or getting in another student's space, "the peer would tell him to stop or move away and then [Student] would kind of just stop engaging in the behavior and would redirect himself back to what he was supposed to be doing."  (Id.).  Tokin, Student's classroom teacher, implemented behavioral modification motivating rewards for Student for good classroom behavior with the result that Student "was earning more [good behavior] stickers than [she] could keep up with on the rewarding, most days."  (AR 2474).  Otherwise, Tokin testified that Student's classroom behavior and learning was on par with his peers.  (See, e.g., AR 2495 (Student tested "middle to top" academically), 2519 (Tokin had no concerns about her "ability to teach [Student], teach the other children with him in the class, or help him control his behaviors"), 2523 (Student did not require

---

[5] At the administrative hearing, Plaintiffs' counsel objected to the introduction of evidence regarding Student's behavior in the fall of 2016 and to the introduction of the October 6, 2016 IEP on the ground that the "remedies we are requesting have to do with the 2015-16 school year and October 6th, 2016 is not during that year."  (AR 2288).  However, the objection was overruled.  (AR 2288-89).  At the district court hearing, Plaintiffs' counsel took issue with Defendant's assertion that Student showed improvement at the beginning of the 2016 school year after the IEP was implemented, noting that Student had three disciplinary referrals in six weeks.  (6/21/18 Hrg. Tr. at 21).

one-on-one aide support in Tokin's classroom and was not a safety risk to himself or others in the classroom).

Nonetheless, however effective the April 2016 may have been once it was implemented, the ALJ expressly found that the failure to conduct an FBA prior to the April 2016 IEP "significantly impeded Parent's [sic] opportunity to participate in the decision making process . . . [and their] ability to participate in the IEP process," and "constitute[d] a denial of FAPE for the period from April 20, 2016 through the end of the school year." (AR 565). The ALJ reasoned that if Defendant had included an FBA in its battery of assessments in the spring of 2016, "the IEP would likely have had valuable information about Student's behavior patterns and antecedents to his aggressive behaviors." (Id.). The ALJ further concluded that this "material information would have assisted Parents in deciding what services Student reasonably needed in order to access his education." (Id.). These findings, including the express finding that the District's procedural error "constitute[d] a denial of FAPE," (id.), are extremely difficult to reconcile with the ALJ's findings elsewhere that "Student did not establish that District failed to offer him a FAPE in the April 2016 IEP." (AR 542). Accordingly, giving due deference to the ALJ's assessment that the delay in conducting an FBA significantly impeded Parents' ability to participate in the IEP process, the Court finds that Defendant failed to offer a FAPE "for the period from April 20, 2016 through the end of the 2016 [extended school year]" and reverses any finding by the ALJ to the contrary. (P Opp. at 5). Because the procedural error "seriously infringe[d]

47

on the parents' opportunity to participate in the IEP formulation process," as found by the ALJ, the Court concludes that the error was not harmless. L.J., 850 F.3d at 1003. Furthermore, because this finding is dispositive on the issue of whether Student was offered a FAPE in April 2016, the Court need not address whether the IEP was defective on any other procedural or substantive grounds.[6] Doug C., 720 F.3d at 1043 ("Where a court identifies a procedural violation that denied a student a FAPE, the court need not address the second [substantive] prong.").

## C. **Purported Remedy Errors**

Plaintiffs contend that the remedies ordered by the ALJ are inadequate because (1) the compensatory remedies did not encompass the entire period during which the ALJ found a violation of the IDEA, account for the equities of Student's deprivation, or order

---

[6] Plaintiffs maintain that apart from the District's failure to provide a functional behavior assessment, the District's assessment of Student was inadequate due to: (1) the psychologist's use of assessment instruments for purposes for which they were not valid and reliable, and her failure to administer an assessment instrument in accordance with the producer's instructions, (P Br. at 11-13); (2) District's failure to properly assess Student's emotional difficulties, despite the recognition that further evaluation was required, (id. at 13-14); and (3) District's failure to review all existing data in connection with its assessment. (Id. at 14-15). According to Plaintiffs, the ALJ "inexplicably" failed to take into account these deficiencies when she determined that the April 2016 IEP satisfied the District's obligations to offer a FAPE. (Id. at 11). However, because the Court's finding that the failure to conduct a FBA denied Student a FAPE from April 20, 2016 to the end of the extended school year, Plaintiffs' additional arguments about the substantive inadequacy of the April 2016 IEP are moot. Accordingly, the Court declines to address these contentions.

any behavioral aide services, (P Br. at 16-18); (2) the compensatory remedies did not incorporate all of Dr. Large's "uncontradicted testimony regarding appropriate compensatory services," (id. at 18-23); and (3) the monetary remedies did not include reimbursement for Dr. Ott's services in early February 2016. (Id. at 23).

### 1.   Determination Of Compensatory Remedies

Plaintiffs claim that the ALJ's compensatory services award was improperly limited to only four and a half months, even though the ALJ found that the District's IDEA violations spanned a longer period.   Plaintiffs further contend that in determining the frequency of the services that would compensate Student for the District's violations, the ALJ improperly applied the same frequency of services provided in the IEP. (Id. at 17).   Finally, Plaintiffs also complain that the ALJ did not award any aide services to compensate for the deprivation of such services in the 2015-2016 school year, even though aide services did not begin until the 2016-2017 school year.  (Id. at 17).

Plaintiffs appear to argue that Student is entitled to compensatory services before December 1, 2015 because the ALJ found, at a minimum, that the District was in violation of its duty to assess Student in all areas of disability during the period between September 16, 2015 and November 30, 2015.   The Court disagrees.  Whether or not Defendant failed to satisfy all of its IDEA obligations during this period, Student was not entitled to

49

placement and services until December 1, 2015.  Accordingly, there
is no loss of services prior to December 1, 2015 to compensate.
Furthermore, because the Court has rejected Plaintiffs' argument
that Defendant's duty to assess arose on August 25, 2015, the
calculation of the period for which compensatory services applies
begins on December 1, 2015, as the ALJ found, and not before.

Plaintiffs also argue that Student is entitled to compensatory
services for the period after April 2016 because the IEP did not
offer a FAPE due to Defendants' continuing failure to assess
Student in all areas of disability and the significant impediment
that failure posed to Parent's ability to participate in the IEP
process.  The Court agrees.  Because the April 2016 IEP failed to
offer a FAPE, the Court shall, in its discretion, consider the
period between April 20, 2016 and the end of the extended 2016
school year in determining whether additional compensatory services
are warranted, as further discussed below.  Although the April 2016
IEP would have offered certain services beginning April 26, 2016
had Parents timely accepted it, the Court has found that due to
procedural errors, the April 2016 IEP did not offer a FAPE.
Accordingly, there was no obligation on Parents' part to accept
the IEP and consideration of an expanded remedies period is
appropriate.

Plaintiffs' contention that the ALJ improperly applied a
"cookie cutter" approach in determining the frequency or amount of
services required to compensate Student is unsupported.  It is
accurate, as Plaintiffs contend, that "[t]here is no obligation to

provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." Parents of Student W. v. Puyallup Sch. Dist., No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994); see also Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 523 (D.C. Cir. 2005) (rejecting parents' contention that each hour without a FAPE entitles the student to one hour of compensatory education on the ground that "compensatory education is not a contractual remedy, but an equitable remedy" requiring the exercise of fact-specific discretion) (quoting Parents of Student W., 31 F.3d at 1497). As the Reid court explained,

> Some students may require only short, intensive compensatory programs targeted at specific problems or deficiencies. Others may need extended programs, perhaps even exceeding hour-for-hour replacement of time spent without FAPE. In addition, courts have recognized that in setting the award, equity may sometimes require consideration of the parties' conduct, such as when the school system reasonably "require[s] some time to respond to a complex problem," [M.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996)], or when parents' refusal to accept special education delays the child's receipt of appropriate services. Parents of Student W., 31 F.3d at 1497.

\\
\\

Reid, 401 F.3d at 524; see also Parents of Student W., 31 F.3d at 1497 ("The behavior of Student W.'s parents is also relevant in fashioning equitable relief."). The Court notes that in both Parents of Student W. and Reid, the court determined that one-for-one compensation either would (Parents of Student W.) or could (Reid) overcompensate for the time lost.

Even though ALJs (and the courts) are not required to offer compensatory educational services of the same type and frequency as those offered in a subsequent IEP, the cases cited by Plaintiffs do not affirmatively preclude them from doing so, depending on the student's needs and the equities of the case. As more fully discussed below, except for certain conclusory, unsupported contentions of Dr. Large, Plaintiffs have not offered any evidence to support a deviation, either up or down, from the ALJ's method of calculating compensatory services. Accordingly, Plaintiffs have not shown by a preponderance of the evidence that the ALJ's compensatory services award was improper simply because the services track the frequency of the services awarded in the IEP.

Plaintiffs assert that the ALJ improperly declined to award Student one-on-one aide services on the irrelevant ground that, pursuant to the April 2016 IEP, "Student is already accompanied by an aide during the unstructured parts of his school day." (AR 575).[7] According to Plaintiffs, whatever services Student is

_____

[7] Pursuant to the April 2016 IEP, Student was receiving 90 minutes per day of "intensive individualized services" on the school campus. (AR 436).

currently receiving have no bearing on the services he should receive as compensation for the past denial of a FAPE because "[a]ppropriate compensatory education services cannot be replaced by services in a subsequent IEP." (P Br. at 16) (citing Boose v. Dist. of Columbia, 786 F.3d 1054 (D.C. Cir. 2015)).  As such, even though the aide services that Student is receiving now may assist Student from this point forward, they will not compensate him for the harm caused by the deprivation of aide services in the past.

In Boose, the D.C. Circuit explained that in contrast to education services offered through an IEP, "compensatory education" consists of:

> education services designed to make up for past deficiencies in a child's program. . . . [B]ecause the Supreme Court has held that IEPs need do no more than provide 'some educational benefit' going forward, [Rowley, 458 U.S. at 200], an education plan conforming to that standard will speak only to 'the child's present abilities,' Reid, 401 F.3d at 523.  Unlike compensatory education, therefore, an IEP 'carries no guarantee of undoing damage done by prior violations,' id., and that plan alone cannot take the place of adequate compensatory education.

Boose, 786 F.3d at 1056; see also Reid, 401 F.3d at 523 (an IEP conforming to a standard that looks to the child's present

abilities "carries no guarantee of undoing damage done by prior violations," which may be "quite severe").

While Plaintiffs do not explicitly rely on any Ninth Circuit cases to advance this argument, the Ninth Circuit has in fact cited the D.C. Circuit with approval on this point. See R.P. ex rel. C.P. v. Prescott Unified Sch. Dist., 631 F.3d 1117, 1125 (9th Cir. 2011). In R.P., the underlying district court had concluded that parents' IDEA action was frivolous because by the time parents initiated suit in district court, "the school district had already taken steps to provide [student] with the programs and staffing they had sought from the ALJ," which the court erroneously interpreted to mean that no further relief could be granted. Id. The Ninth Circuit reversed, noting that parents had prayed for all relief that was available, which would include "compensatory education as a remedy for the harm a student suffers while denied a FAPE." Id. The Ninth Circuit explained: "Compensatory education is an equitable remedy that seeks to make up for 'educational services the child should have received in the first place,' and 'aim[s] to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.'" Id. (quoting Reid, 401 F.3d at 518). The R.P. court specifically noted that "even if the parents were happy with the current IEP, they could reasonably have expected the district court to use its equitable powers to help bring [student] to the point he would have been, had he received a FAPE all along." Id. at 1126. Accordingly, R.P. strongly suggests that compensatory education services are

distinct from services provided pursuant to a subsequent IEP and serve a different purpose.

The Court finds Plaintiffs' contention that some amount of one-on-one aide services should be awarded to compensate Student for services he would have received had he been timely offered a FAPE to be persuasive. The Court further finds that these compensatory education services are not satisfied by the one-on-one aide services provided in Student's April 2016 IEP because the purpose of <u>compensatory</u> aide services is to bring Student as close to where he would be today if he had not been deprived of such services in the past. However, because compensatory education is an equitable remedy, the Court's guiding principle must be to fashion an award that will be sufficient to help Student reach the position he would be in now if he had been offered services in the past, but not more. The Court will address the particulars of its remedies award in Part VII.C.3 below.

**2. Dr. Large's Testimony Regarding Appropriate Compensatory Education Services**

Plaintiffs contend that even though the ALJ found Dr. Large's testimony very credible and purported to give her assessments of Student "significant weight," (see AR 550), she improperly failed to incorporate much of Dr. Large's "uncontradicted opinion testimony regarding the appropriate compensatory education remedies to compensate [Student] for the District's failures." (P Br. at 22). Particularly with respect to Dr. Large's

55

recommendation that Parents receive training, Plaintiffs emphasize that in September 2016, when the District completed an ISES assessment pursuant to the April 25, 2016 follow-up Assessment Plan, the assessor determined that Student "meets the criteria for eligibility for ISES" and recommended that "the IEP consider[] adding ISES which will include individual therapy and social work services." (Id. at 23) (quoting AR 485). The assessor further stated: "Parental involvement will be important and highly beneficial as parent[] training and collaborative problem solving and support will increase the chances of high efficacy levels in the implemental of therapeutic techniques and consistent structure." (Id.).

Dr. Large recommended, among other things, that Student's IEP should include "four to six hours per week" of home-based behavioral intervention services incorporating both Mother and Father, (AR 419); respite care "so that [Parents] can have a break from the intensity of [Student's] behavior," (AR 420); and a "full-time aide" to provide "one-to-one behavioral support." (Id.). Dr. Large testified that an award of compensatory education services to make up for ground lost by not timely offering an IEP should include 200-250 hours of behavioral intervention services by a behavioral aide, 100 hours of intensive social emotional service, 50-70 hours of speech and language services to address social interaction, and 50 hours of parent training. (AR 1333-36).

\\

\\

In the Decision, the ALJ explained that she was giving "less weight" to Dr. Large's critiques of Defendant's assessment of Student's present levels of performance and its goals for Student in the IEP due to the conclusory nature of the critiques, their lack of alternative proposals, and Dr. Large's admissions that "she did not have experience developing IEPs" and that "she is not an expert on developing measurable Student goals for an IEP." (AR 556, ¶¶ 59-60). The ALJ then addressed Dr. Large's proposed compensatory remedies:

> Dr. Large further opined that the District's offer of
> FAPE was inadequate because it should have included:
> home-based intervention services, parent training and a
> 1-to-1 trained aide for Student throughout the school
> day. Dr. Large did not describe the nature or extent of
> the home-based intervention services or the parent
> training she referred to with any specificity. She only
> opined that it was essential that school personnel and
> Parents be consistent with strategies used with Student
> to extinguish his negative behaviors. She also
> recommended Student receive mental health services, but
> she did not specifically describe those services, or
> explain if such mental health services differed
> materially, or at all and in what way, from the 60
> minutes a week of designated instructional service
> individual counseling that District offered Student.
> Any weight given to Dr. Large's recommendations was
> undermined by the absence of material specificity

regarding the nature, and for some recommendations the extent (duration and frequency) of the services she endorsed for Student. Also, her report stated that a full time aide should be only considered for Student. However, she testified at hearing that Student should have a full time aide because he presented a safety risk. This inconsistency also undermined her recommendation that Student needed a full time aide.

(Id. ¶ 61).

Additionally, with particular respect to Dr. Large's contention that Student was entitled to additional parent training or "home-based behavioral interventions," (see AR 1260), the ALJ noted that:

Evidence established [that] District personnel and Mother frequently communicated about Student's behaviors, strategies used at school[,] and consequences. Student failed to establish that Parent training was necessary to create consistency between strategies used at school and at home. The continued frequent communication between school and Parents should reasonably suffice to assure that District and Parents consistently use strategies to address Student's behavioral and emotional difficulties. Also, Student offered no evidence proving Parents' dealings with Student at home was inconsistent with, or in any way

undermined, the strategies used by District personnel with Student at school. Therefore, District did not deny Student a FAPE at any time from April 26, 2015 through the end of the 2016 extended school year by failing to offer him the designated related service of Parent training addressing his behavioral and emotional difficulties.

(AR 571-72, ¶ 48).

Accordingly, the ALJ concluded that, based on the eighteen-week period between December 1, 2015 and April 26, 2016[8] during which Student should have received services had his IEP been timely implemented, Student was entitled to the following compensatory education services:

- 18 hours of individual counseling from a credentialed District counselor;
- 18 hours of speech and language therapy from a District speech and language pathologist; and
- 150 minutes of behavior intervention services from a District behaviorist.

---

[8] The ALJ's eighteen-week calculation does not appear to have differentiated between weeks in which the school was closed for vacation and weeks when school was actually in session. Accordingly, although the ALJ stated in the Decision that the amount of the compensatory services awarded "coordinates to the amount of services offered per week or year in the April 2016 IEP," for services calculated on a weekly basis, the ALJ's compensatory award may actually be somewhat generous, as it provided compensation for weeks when school was not in session.

(AR 575). However, as noted above, the ALJ did not award additional one-on-one aide services as compensatory education on the ground that "Student [was already being] accompanied by an aide during the unstructured parts of his school day." (Id.).

The Court has already concluded that some award of one-on-one aide services is warranted as compensatory education. However, with respect to the remainder of Dr. Large's recommendations, the Court finds that the ALJ thoughtfully considered the remedies proposed by Dr. Large and gave well-reasoned explanations as to why she did not give them the weight Plaintiffs argue they deserve. Plaintiffs have not shown by a preponderance of the evidence that the compensatory services awarded by the ALJ were inadequate because they did not incorporate all of Dr. Large's recommendations. Accordingly, Plaintiffs' remedies claim concerning Dr. Large's recommendations, with the exception of the one-on-one aide services, is DENIED.

### 3.   **Proper Remedies**

An award of compensatory educational services is an equitable remedy that requires the exercise of fact-specific discretion. Reid, 401 F.3d at 523. The purpose of any award is to help bring disabled students "to the point where [they] would have been, had [they] received a FAPE all along." R.P., 631 F.3d at 1126. "The courts have discretion on how to craft the relief" and, as noted earlier, there is "no obligation to provide a day-for-day

compensation for time missed." <u>Park</u>, 464 F.3d at 1033 (internal quotation marks and citation omitted).

For the reasons stated above, the Court finds that Student is entitled to compensatory education services for an additional seven weeks beyond the period identified by the ALJ, from April 20, 2016 through June 9, 2016, the last day of school for elementary school students in the Conejo Valley Unified School District for the 2015-2016 school year. (<u>See</u> AR 319). However, the Court also defers to the ALJ's well-considered reasons for not giving significant weight to the full range of remedies advanced by Dr. Large. Plaintiffs have not shown that Student is entitled to substantially more hours of remedial education for the services awarded by the ALJ than the amounts awarded by the ALJ. Accordingly, the Court will increase those awards proportionately as follows:

- An additional 7 hours of individual counseling from a credentialed District counselor, for a total award of 25 hours, including the ALJ's award;
- An additional 7 hours of speech and language therapy from a District speech and language pathologist, for a total award of 25 hours, including the ALJ's award; and
- An additional 60 minutes of behavior intervention services from a District behaviorist, for a total award of 210 minutes, including the ALJ's award.

With respect to one-on-one aide services, the Court notes that the April IEP awarded Student "90 minutes daily of intensive instructional services, consisting of 1-to-1 adult support for Student during unstructured times in the school day (both recesses, lunch and priming before and during recess)." (AR 554-55). Accordingly, if Student had been offered an IEP on December 1, 2015, as the ALJ determined he should have been, he would have received 450 minutes of one-on-one aide services per week from that point forward for the 25-week period ending on June 9, 2016. However, as a matter of logic, he would not have received one-on-one aide services to assist with lunch and recess for the days when school was not in session. This would include the Winter Recess from December 21, 2015 through January 1, 2016 (ten weekdays); the Spring Recess from March 25 through April 1, 2016 (six weekdays); and the following one-day holidays: Martin Luther King Day (1/18/16), Lincoln's Day (2/12/16), Washington's Day (2/15/16) and Memorial Day (5/30/18). Accordingly, Student would have received one-on-one aide services, at most, for a period of approximately twenty-one weeks, for a total of 9,450 minutes, or 157.5 hours.

Although Plaintiffs summarily argue that the ALJ should have awarded one-on-one aide services as part of a compensatory remedy, (P Br. at 17-18), and Dr. Large testified that somewhere between "200 and 250 hours" of aide services would be a fair compensatory award, (AR 1334), Plaintiffs have not satisfactorily explained why any particular amount of aide services is warranted. For example, Plaintiffs have not shown by a preponderance of the evidence that Student's behavior deteriorated to such a point over his

kindergarten year that he requires even 157.5 hours of aide services to reach the position where he would be had he timely received such services, much less more than that amount. Furthermore, to the extent that Dr. Large recommended that Student be assigned a one-to-one aide to ensure the safety of other students, it is plain that an award of additional aide services now would not make Student's fellow students in the past any safer. (See AR 1413-14) (Dr. Large's testimony that she is recommending an aide for Student "[m]ost certainly to ensure the safety of his peers and also to ensure his own safety").

The Court is willing to accept that Student may have gained some additional insight into and control over his behavior had he been accorded a one-on-one aide during recess and lunch from December 1, 2015 on. At the same time, considering (1) the multiple purposes for which a one-on-one aide may serve, only some of which pertain to those goals, (2) Plaintiffs' failure to present evidence of the exact amount of aide services that would promote those purposes, (3) evidence of Student's progress in controlling his behavior, and (4) the equities of the award, including Plaintiffs' own responsibility for causing or prolonging the delay in the implementation of an IEP, the Court concludes that an award of 52.5 hours of one-on-one aide services, approximately one-third of the amount that Student would have received had his IEP been timely implemented, should roughly compensate Student for losses suffered or gains not achieved due to the lack of aide services in his kindergarten year.

## 4.    Reimbursement For Dr. Ott's Services

Dr. Ott, a psychiatrist, assessed Student in February 2016 with conduct disorder, mood disorder, and disruptive mood dysregulation disorder.  (AR 342).  His assessment was discussed at the Third SST meeting on February 10, 2016 and appears to have been a factor in the decision to put forward an Assessment Plan for Student.  (AR 866-87).  Plaintiffs argue that they are entitled to reimbursement in the amount of $700.00 for Dr. Ott's services, which the ALJ denied on the ground that Student had failed to establish that Dr. Ott's services "were reasonably necessary for Student to access his education at the times at issue in this proceeding."  (AR 575).

Carmona testified that the decision to conduct an assessment in February 2016 was taken based on both the escalation of Student's behavior and Dr. Ott's diagnoses, and that it was the diagnosis of disruptive mood disregulation disorder "that really concerned [her]."  (AR 866).  While the ALJ found that the District had enough evidence to order an assessment by September 16, 2015 and should have done so, in fact the District did not act on the information it had until it considered Dr. Ott's diagnoses.  The District cannot plausibly argue, as it did in the underlying proceedings, that it had no obligation to assess Student until February 2016 and then contend that the information it received in February 2016 was of no import.  Accordingly, the Court reverses the ALJ's decision with respect to Dr. Ott's services and ORDERS

the District to reimburse Parents in the amount of $700.00 for his

fees.

**E.    Request For Attorneys' Fees**

Plaintiffs pray for "attorneys fees as the prevailing parties,

pursuant to a subsequently filed motion for attorneys fees."  (P

Br. at 24).  The Ninth Circuit instructs:

> The IDEA provides that a "court, in its discretion, may
>
> award reasonable attorneys' fees as part of the costs to
>
> the parent or guardian of a child or youth with a
>
> disability who is a prevailing party." 20 U.S.C.
>
> § 1415(i)(3)(B)(i)(I).  A parent need not succeed on
>
> every issue in order to be a prevailing party.  Park v.
>
> Anaheim Union High Sch. Dist., 464 F.3d 1025, 1035 (9th
>
> Cir. 2006).  Rather, parents are prevailing parties if
>
> they "succeed [] on any significant issue in litigation
>
> which achieves some of the benefit [they] sought in
>
> bringing the suit." Id. at 1034 (emphasis in original)
>
> (citation omitted).

M.C., 858 F.3d at 1201; see also Meridian Joint Sch. Dist. No. 2

v. D.A., 792 F.3d 1054, 1065 (9th Cir. 2015) ("[T]o be a 'prevailing

party,' a party must 'succeed[] on any significant issue in

litigation which achieves some of the benefit the parties sought

in bringing the suit.'") (quoting Van Duyn, 502 F.3d at 825); Y.Z.

ex rel. Arvizu v. Clark Cnty. Sch. Dist., 54 F. Supp. 3d 1171, 1175

(D. Nev. 2014) ("A plaintiff is a 'prevailing party' entitled to fees under the IDEA if he (1) brings an action and is provided judicially-sanctioned relief, also referred to as relief with sufficient 'judicial imprimatur,' and (2) the relief changes the legal relationship between plaintiff and defendant."). "The Ninth Circuit has construed the IDEA to justify awarding attorneys' fees to parents who prevailed at an administrative hearing." <u>Miller ex rel. Miller v. San Mateo-Foster City Unified Sch. Dist.</u>, 318 F. Supp. 2d 851, 863 (N.D. Cal. 2004) (citing <u>McSomebodies (No. 1) v. Burlingame Elementary Sch. Dist.</u>, 897 F.2d 974, 975 (9th Cir. 1989)).

The Court agrees that an award of attorneys' fees appears appropriate here. Plaintiffs may file a Motion for Attorneys' Fees within thirty days of the date of this Order. The Motion shall address whether an award of attorneys' fees is warranted for both the underlying administrative proceeding and, separately, for the action in this Court, and shall include a detailed declaration to support any amounts requested, including the information necessary for the Court to evaluate whether the hourly rate and the hours requested are reasonable. The District's Opposition shall be due within fourteen days of service of the Motion. Plaintiffs' Reply, if any, shall be filed within seven days of service of the Opposition.

\\

\\

\\

\\

# VIII.

## CONCLUSION

For the reasons stated above and on the record at the hearing, Plaintiffs' Appeal is GRANTED IN PART and DENIED IN PART. The Court reverses the portion of ALJ's Decision finding that the April 2016 IEP offered Student a FAPE despite Defendant's failure to conduct a functional behavior assessment and the significant impediment that failure posed to Parents' meaningful participation in the IEP process. The Court further reverses the ALJ's finding that Student should not be awarded any compensatory education one-on-one aide services. Accordingly, the Court AWARDS Student an increase in the compensatory education services granted by the ALJ to include an additional: seven hours of individual counseling by a credentialed District counselor; seven hours of speech and language therapy from a District speech and language pathologist; sixty minutes of behavior intervention services from a District behaviorist; and fifty-two and a half hours of one-on-one aide services. Plaintiffs' request for reimbursement of $700.00 for the cost of Dr. Ott's services is GRANTED. All of Plaintiffs' remaining claims and requests are DENIED. Plaintiffs may file a Motion for Attorneys' Fees within thirty days of the date of this Order, as more fully provided in Part VII.E above.

DATED: July 27, 2018

                                    /S/
                    _____
                    SUZANNE H. SEGAL
                    UNITED STATES MAGISTRATE JUDGE